2024 IL App (3d) 230431

Opinion filed December 30, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| MENARD, INC., a Foreign Corporation, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS FARMERS INSURANCE CO., | ) | Appeal No. 3-23-0431 |
| An Illinois Corporation, and PATRICK | ) | Circuit No. 17-MR-0609 |
| CIRONE, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Illinois Farmers Insurance Co., Defendant- | ) | John C. Anderson, |
| Appellant.) | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justice Davenport concurred in the judgment and opinion.
Presiding Justice McDade dissented, with opinion.

_____

**OPINION**

¶ 1     The circuit court granted a cross-motion for summary judgment by plaintiff-appellee,

Menard, Inc.'s (Menards), as to defendant-appellant Illinois Farmers Insurance Co.'s (Farmers)

duty to defend Menards in an underlying negligence suit. The underlying negligence suit

subsequently settled. Farmers, which funded the settlement, reserved the "right to a claw back on

the payment of the settlement funds should there be a ruling on appeal that Farmers had no duty

to defend Menards." Farmers appeals the circuit court's finding that it had a duty to defend, arguing that Menards was not "using" the insured vehicle, a cargo van, at the time of the injury. Also, for the first time, Farmers argues that the circuit court should have adhered to the eight corners rule and declined to consider extrinsic evidence in determining whether Menards was "using" the van. We determine that the circuit court correctly found, for the purposes of establishing a duty to defend, that Menards was "using" the van and that Farmers has forfeited its eight corners argument, which is, in any event, without merit. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3        In April 2014, the plaintiff in the underlying negligence suit, Patrick Cirone, drove his insured cargo van to Menards to pick up an order of house siding. As will be detailed below, Menards employees instructed him where to park and, according to Cirone, where to stand, and planned to load the siding onto the roof of the vehicle. Cirone gave Menards permission to load the vehicle. After Menards began executing its plan to load, but before the siding was removed from the rack, a Menards employee drove over Cirone's foot with a forklift.

¶ 4        In July 2016, Cirone filed the operative, underlying negligence complaint against Menards and its employee, Juan Beltran. Cirone alleged that he was a business invitee at Menards when it, through Beltran (1) carelessly and negligently operated a forklift in a manner that was unsafe and dangerous for store patrons, including Cirone; (2) failed to secure the area where Beltran was operating the forklift to prevent patrons, including Cirone, from being injured; (3) failed to warn patrons, including Cirone, of the dangerous activity being conducted through the operation of the forklift equipment on the premises; and (4) was otherwise careless and negligent. The underlying complaint does not mention Cirone's insured cargo van.

¶ 5        On September 18, 2017, Menards filed the operative, three-count complaint for declaratory judgment against Farmers. Menards alleged (1) a duty to indemnify (count I), (2) a duty to defend (count II), and (3) a claim for reasonable attorney fees (count III). It attached the underlying complaint; Farmers' policy of insurance for the cargo van; and other evidence such as answers to interrogatories, Cirone's deposition testimony, and correspondence between Menards and Farmers.

¶ 6        The attached evidence showed, and neither party disputes, that Cirone drove to Menards in his 2006 Chevrolet Express cargo van to pick up an order of siding for his house. The Menards gate guard told Cirone where to park and, generally, where his order was located. The space Cirone was instructed to park in was "close" to his order. The guard further instructed that Cirone should go inside and an employee would *come out* and get a forklift, take down the siding, and load the siding on top of Cirone's cargo van.

¶ 7        As instructed, Cirone went inside and showed his paperwork to Menards employee Jose Gomez. Gomez then led Cirone *back outside* until another employee was able to get Cirone's order. A skid of landscaping cement blocked access to Cirone's order. Therefore, Menards planned to use two forklifts to retrieve Cirone's order. The first forklift, driven by Beltran, would move the landscaping cement. The second forklift, driven by Javier Granados, would then have the space to retrieve Cirone's order and bring it to Cirone's cargo van. Beltran testified in his deposition that he considered himself to be working in concert with other Menards employees to get Cirone's order onto the van. Beltran further testified that he understood Cirone to have consented to this process:

            "Q. [A] fair inference from what you observed, which is obviously him walking out, going in, getting someone to help him, the subsequent moving of two forklifts, it's

3

apparent to you that [he] was aware and acquiescing, if you will—maybe even asking that it be loaded onto the van?

A.  Correct.

* * *

Q. There is, in your world, no other option at this point of getting the load off the rack onto his van other than the team of Menard employees to load it onto the van?

A. Nope."

¶ 8      Cirone recalled watching the first forklift (Beltran) move the landscaping cement before turning his attention to the second forklift (Granados). While Cirone watched the second forklift, the first forklift backed up and stopped on Cirone's foot and ankle. At the time Cirone was struck, the second forklift driver had not yet touched Cirone's order. As such, Menards never completed its plan to move the order from the product rack, put it on the ground, and move it to the roof of Cirone's cargo van.

¶ 9      Another Menards employee, Gumaro Sanchez, testified in his deposition consistent with Cirone. Sanchez witnessed the accident from approximately 60 feet away, a distance he characterized as "far." As Gomez had explained, Cirone had been standing near the product rack. However, Cirone then moved into the path of Beltran's forklift. Sanchez was about to shout a warning, but he was afraid he would startle Cirone and make the situation "worse." At the time of the accident, Cirone was looking up at the forklift that was about to pick up his order. Sanchez explained that Granados's forklift had lined up with Cirone's order: "The ends were already up there." Sanchez later elaborated:

"Q. Was Mr. Cirone looking up at the order that was being lowered?

A. All the guys were looking to the top. Yes."

4

¶ 10     While Cirone and Menards employees did not testify to exact measurements from the accident to the van, Cirone testified that he was instructed to park the van "close" to his order. Beltran testified that large orders such as Cirone's were kept in the outside storage yard. The order itself was 16 feet long and rested on product racks, attached to the wall, that were 22 feet long. Cirone testified, "It's *not* bays, it's one wall that's all it is." (Emphasis added.) Beltran moved the cement obstacle 10 to 12 feet from the wall to create space for the second forklift. After setting down the cement, Beltran reversed less than two feet before hitting Cirone. Menards employees saw Cirone standing by the product rack in a spot they considered "safe" before he moved several feet to a spot they considered unsafe, at which point the accident unfolded within seconds.

¶ 11     The attached insurance policy provided in relevant part: "We will pay for damages for which any insured person is legally liable because of bodily injury to any person and/or property damage *arising out of the* ownership, maintenance or *use* of a private passenger car, utility car, or utility trailer." (Emphases added.) The policy further defined "insured person" as "you [(Cirone)] or any family member" and "*any other person using your insured car*." (Emphasis added.)

¶ 12     Menards argued that it was an "insured person" under Cirone's insurance policy. It cited the policy's definition of "insured person" and further noted that section 7-317(b) of the Illinois Vehicle Code (625 ILCS 5/7-317(b)(2) (West 2016)) provides that a motor vehicle liability policy such as the owner's policy in this case "[s]hall insure the person named therein and *any other person using or responsible for the use of such motor vehicle* or vehicles with the express or implied permission of the insured." (Emphasis added.) It alleged that Cirone authorized Menards employees to use the vehicle for the purpose of loading.

¶ 13     Menards asserted that Illinois follows the "complete operations" doctrine, which provides that loading includes all actions and preparatory steps necessary to place an item in a vehicle. It

cited *Estes Co. of Bettendorf, Iowa v. Employers Mutual Casualty Co.*, 79 Ill. 2d 228, 233 (1980) (unloading includes all the operations necessary to effectuate a delivery), and *Menard, Inc. v. Country Preferred Insurance Co.*, 2013 IL App (3d) 120340, ¶ 27 ("loading includes the entire process of moving an article, including acts in preparation for loading"). Menards argued that, according to the complete operations doctrine, the acts taken toward obtaining Cirone's order constituted a part of the loading process and Cirone was injured during that loading process.

¶ 14      At a minimum, Menards continued, the facts alleged bring the action potentially within the scope of Cirone's insurance policy's coverage, thus triggering a duty to defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage. See *Korte Construction Co. v. American States Insurance*, 322 Ill. App. 3d 451, 456-57 (2001). In this case, of course, it was Menards, and not Farmers, who initially sought a declaratory judgment.

¶ 15      On October 5, 2018, Menards filed a motion for summary judgment as to count II (duty to defend). In addition to Cirone's deposition, it also attached the deposition testimony of Menards employees, including Gomez, Sanchez, and Beltran. That same date, Farmers filed a cross-motion for summary judgment as to all three counts. The parties agreed that, as to a duty to defend, the dispositive question was whether Menards was "using" Cirone's cargo van at the time of the injury. Farmers further contended that, were it to prevail on the duty-to-defend issue, the other two counts would resolve in its favor. Each party pointed to extrinsic evidence, such as the depositions and answers to interrogatories referenced above, in support of its respective position.

¶ 16      On January 25, 2019, the circuit court entered the following order:

> "Matter comes on having heretofore been taken under advisement on cross motions for summary judgment now comes on for decision. Court finds that: Illinois Farmers Insurance Company's Cross Motion for Summary Judgment is denied. Court finds

Menards was loading the vehicle under the complete operations doctrine. Menards' Motion for Summary Judgment on Count II is granted. The Court finds the injury occurred during Menards' 'use' of the vehicle. Menards' employees were authorized users and Cirone's injuries were causally connected. Defendant owes Menards a defense in Cook County Case 16L2011 under Farmers Policy #197312491. Case continued for status on remaining claims/underlying litigation[.]"

¶ 17    On February 25, 2019, Farmers moved to reconsider. Primarily, it argued that the circuit court erred in denying its motion for summary judgment as to count III, attorney fees. It noted that, under Illinois law, a plaintiff in a declaratory judgment action could only receive attorney fees if an insurer's conduct was vexatious and unreasonable. Here, it continued, the evidence on record did not meet that standard as a matter of law. Secondarily, Farmers reiterated its arguments pertaining to counts I and II.

¶ 18    On April 2, 2019, the circuit court granted Farmers' motion to reconsider on the issue of attorney fees. It explained that it had inadvertently omitted discussion of count III in its January 25, 2019, order. It rejected Farmers' arguments pertaining to counts I and II. It also denied Farmers' oral motion for a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) to allow an immediate appeal of its ruling on count II, the duty to defend.

¶ 19    On August 23, 2019, Farmers again moved for a Rule 304(a) finding to allow an immediate appeal of the circuit court's ruling on count II, the duty to defend. It informed the court that, on April 19, 2019, Cirone and Menards had settled the underlying negligence suit. Farmers "funded" the underlying settlement, though it reserved the "right to a claw back on the payment of the settlement funds should there be a ruling on appeal that Farmers had no duty to defend Menards."

¶ 20    On August 24, 2019, the circuit court entered the following order:

7

"This cause coming before the Court for status and the Court being fully advised in the premises, IT IS HEREBY ORDERED:

1. Count I of Plaintiff Menard, lnc.'s First Amended Complaint ('Declaratory Judgment-Duty to Indemnify') is voluntarily dismissed with prejudice. Each party shall bear their own costs and attorneys' fees.

2. Having disposed of the sole remaining claim before the Court, this is a final and appealable order as to all claims."

This appeal followed.

¶ 21                                    II. ANALYSIS

¶ 22        Farmers appeals the circuit court's grant of summary judgment to Menards on count II, the duty to defend. It argues that Cirone's injuries did not, even potentially, arise out of the "use" of the insured cargo van under either of the theories accepted by the circuit court: the complete operations doctrine or the reasonable contemplation test (which looks for a sufficient causal connection). Farmers also argues, for the first time on appeal, that the circuit court should have adhered to the eight corners rule and declined to consider extrinsic evidence in determining whether Menards was using the insured cargo van. However, Farmers forfeited its eight corners argument, which is, in any event, without merit.

¶ 23            A. Summary Judgment, Insurance Policies, and the Duty to Defend

¶ 24        Summary judgment is appropriate only when pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016). Here, the parties filed cross-motions, and thus, they agree that no factual issues exist and that the disposition of the case turns on the circuit court's resolution

8

of purely legal issues. *Maryland Casualty Co. v. Dough Management Co.*, 2015 IL App (1st) 141520, ¶ 45. We review *de novo* the circuit court's grant of summary judgment to Menards on count II, the duty to defend. *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 399-400 (2010).

¶ 25     The construction of an insurance policy is also a question of law appropriate for disposition by summary judgment and reviewed *de novo*. *Id.* at 399. Insurance policies are subject to the rules of contract interpretation. *Menard*, 2013 IL App (3d) 120340, ¶ 18. The court's primary objective is to give effect to the intention of the parties as set forth by the policy's language. *Id.* If the words of a policy are clear and unambiguous, they will be given their plain and ordinary meaning. *Id.* If the words of a policy are ambiguous, they will be construed against the drafter. *Id.*

¶ 26     "The duty to defend is much broader than the duty to indemnify, because the duty to defend is triggered if the complaint *potentially* falls within the policy's coverage; the duty to indemnify, on the other hand, applies only when the resulting loss or damages *actually* come within the policy's coverage." (Emphases in original.) *Id.* ¶ 24. An insurer has a duty to defend if the underlying complaint alleges facts that fall within, or potentially within, the policy's coverage. *Id.* Both the underlying complaint and the insurance policy should be liberally construed in favor of the insured. *Id.* ¶ 25. Here, the circuit court considered the underlying complaint, supplemented by attached extrinsic evidence such as depositions, in determining that the alleged facts fell within, or potentially within, the policy's coverage. See *Pekin Insurance Co. v. Pulte Home Corp.*, 404 Ill. App. 3d 336, 344 (2010) (the circuit court determined, after considering the underlying complaint and other evidence, that the alleged facts potentially brought the action within coverage).

¶ 27     B. Use Includes Loading and Unloading: *Schultz* and *My Personal Taxi*

9

¶ 28    We first look to the language of the policy to determine whether use of the insured cargo van includes loading. Motor vehicle insurance policies in Illinois must comply with Illinois statutory requirements. *Schultz*, 237 Ill. 2d at 399. By statute, policies must insure not only the persons named in the policy but also "any other person using or responsible for the use of such motor vehicle or vehicles with the express or implied permission of the insured." 625 ILCS 5/7-317(b)(2) (West 2016). The statute does not define "user" or "use." *Schultz*, 237 Ill. 2d at 401.

¶ 29    In *Schultz*, the supreme court relied upon the following plain and ordinary meaning of the words user and use: "A user *** is simply one who makes use of a thing. 'Use,' in turn, is synonymous with 'EMPLOY, UTILIZE, APPLY, [and] AVAIL[. It] is general and indicates any putting to service of a thing ***.' " *Id.* (quoting Webster's Third New International Dictionary 2524 (1976)). The supreme court favorably quoted the New Jersey Supreme Court in *Jaquez v. National Continental Insurance Co.*, 835 A.2d 309, 314-15 (N.J. 2003), which held that use in the context of motor vehicle insurance is broader than operation and that "[o]ne uses an automobile whenever such use is rationally connected to the vehicle for the purpose of providing transportation *or satisfying some other related need of the user*." (Internal quotation marks omitted.) (Emphasis added.) *Schultz*, 237 Ill. 2d at 401-02. Our supreme court concluded that this definition of use clearly included passengers as well as drivers. *Id.* at 403.

¶ 30    In a footnote, it observed:

       "Some courts have concluded that one can be 'using' a motor vehicle even when one is not occupying it as either a driver or passenger at the time the injury is sustained. See, *e.g.*, *Georgeson v. Fidelity & Guaranty Insurance Co.*, 48 F. Supp. 2d 1262, 1267-68 (D. Mont. 1998) (applying Montana law). It has been held, for example, *that one is 'using' a vehicle, for purposes of insurance coverage, when loading personal belongings into it or*

10

*unloading personal belongings from it*. See, *e.g.*, *Travelers Insurance Co. v. Aetna Casualty & Surety Co.*, 491 S.W.2d 363, 365 (Tenn. 1973). The concept of use does, however, have its limits. For example, one Illinois appellate decision held that an individual who was acting as a spotter and directing the [movements] of the truck's driver at the time the truck struck and killed a pedestrian at a construction site was not, himself, using the truck within the meaning of the insurance policy's provisions. See *Apcon Corp. v. Dana Trucking, Inc.*, 251 Ill. App. 3d 973[, 979] (1993). Because none of these circumstances are before us here, we express no view on them." (Emphasis added.) *Id.* at 402 n.3.

¶ 31    In *First Chicago Insurance Co. v. My Personal Taxi & Livery, Inc.*, 2019 IL App (1st) 190164, the First District was presented with one of the circumstances identified in the *Schultz* footnote. There, the company that owned the insured vehicle provided nonemergency medical transportation to the public. *Id.* ¶ 5. The company's agent transported the plaintiff in the underlying negligence suit to the hospital. *Id.* After arriving on the hospital grounds and exiting the insured vehicle, the agent allegedly caused the plaintiff, who was blind, to walk into a cement pillar, and the plaintiff was injured. *Id.* The insurer of the vehicle sought a declaratory judgment that it had no duty to defend because the company was not "using" the vehicle at the time of the injury. *Id.* ¶ 6. In its view, the relationship between the plaintiff's injury and the use of the insured vehicle was " 'merely incidental' " and " 'too remote.' " *Id.* ¶ 9. The trial court agreed. *Id.* ¶ 15. It reasoned that "there must be a rational connection of the vehicle to the alleged use and concluded that [the plaintiff's] use of the [insured] vehicle ended when he exited the vehicle." *Id.*

¶ 32    The appellate court reversed, explaining, "[n]otably, the policy at issue does not expressly exclude from coverage injuries arising from the 'loading' and 'unloading' of passengers." *Id.* ¶ 24. The policy expressly covered the loading process for property, and it defined the start and end

11

point, excluding coverage for injuries " 'resulting from the handling of property [b]efore it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or [a]fter it is moved from the covered "auto" to the place where it is finally delivered by the "insured." ' " *Id.* From this, the court concluded that the insurer knew how to draft a loading exclusion but placed no exclusion on the loading or unloading of passengers. *Id.* Also, whether unloading passengers or property, the policy did not exclude coverage for injuries arising before the acceptance of the delivery, even if that delivery was outside the insured vehicle. *Id.* ¶ 25. The court added: "[A]ssisting a passenger the last few steps from the livery vehicle to the destination itself is rationally connected to, and a reasonable consequence of, the livery driver and passenger using the [insured] livery vehicle to take the passenger most of the way there." *Id.* ¶ 26.

¶ 33    In holding that "use" includes loading and unloading of passengers unless the policy states otherwise, the *My Personal Taxi* court cited the same out-of-state cases cited by our supreme court in *Schultz*: *Jaquez* and *Travelers Insurance Co. v. Aetna Casualty & Surety Co.*, 491 S.W.2d 363 (Tenn. 1973). *Jaquez*, in turn, cited *Kennedy v. Jefferson Smurfit Co.*, 688 A.2d 89, 91 (N.J. 1997), which held that "use" of a vehicle includes loading and unloading. *Travelers* held the same. *Travelers*, 491 S.W.2d at 365. Both *Kennedy* and *Travelers* went on to apply the complete operations doctrine to decide whether the negligent acts at issue occurred during the loading and unloading process despite the absence of an express loading and unloading provision. *Kennedy*, 688 A.2d at 92; *Travelers*, 491 S.W.2d at 365.

¶ 34                    C. Loading Includes Acts in Preparation for Loading:

                    The Complete Operations Doctrine, *Estes*, and *Menard*

¶ 35    At oral argument, Farmers essentially accepted that use of an insured vehicle includes loading and unloading unless the policy expressly provides otherwise. Instead, Farmers argued

12

that Menards' alleged negligent actions did not constitute loading. Again, the alleged negligent acts at issue here include not only the operation of the forklift but also the failure to secure the loading area or otherwise warn patrons of the "dangerous" activities conducted through the operation of forklift equipment. Illinois courts have used the complete operations doctrine to define loading. For our purposes, *Estes* and *Menard* best illustrate the complete operations doctrine.

¶ 36      In *Estes*, the Illinois Supreme Court adopted the complete operations doctrine. There, the policy insuring the vehicle used for the delivery of concrete provided coverage for bodily injury " 'caused by an occurrence and arising out of the ownership, maintenance[,] or use, including loading and unloading, of any [insured] automobile.' " *Estes*, 79 Ill. 2d at 231-32. The named insured, Rock Island Ready Mixed Concrete Company (Ready Mix), sent its delivery driver in its insured vehicle to deliver cement to a construction site. *Id.* at 231. Ready Mix placed the cement in the receptacle provided at the construction site. *Id.* at 235. The cement was then delivered by a crane operated by another company to locations on the construction site where the cement would be poured into "forms." *Id.* at 230-31. However, after Ready Mix deposited the cement in the designated receptacle, the crane operator picked it up and came into contact with a high-voltage electrical cable, injuring two employees of a subcontractor. *Id.* at 231.

¶ 37      The *Estes* court was tasked with deciding whether the injury occurred during the loading process. *Id.* at 232-34. It considered two competing doctrines, the "coming to rest" doctrine and the "complete operations" doctrine. *Id.* at 233. The "coming to rest" doctrine is narrow in scope in that

> "the unloading process includes *only the actual moving of the article* from the motor vehicle until it first comes to rest. [Also], [w]hen the article has begun to move toward its

13

final destination, independent of the motor vehicle, the vehicle is no longer connected with the process of unloading." (Emphasis added.) *Id.*

¶ 38    The "complete operations" doctrine, in contrast, is broad in scope in that it "includes all the operations necessary to effect a completed delivery." *Id.* After defining each doctrine, the supreme court summarily held: "[T]he 'complete operations' doctrine, which embraces all of the operations necessary to effect a completed delivery of the article, is the preferred view." *Id.*

¶ 39    The *Estes* court then went on to determine whether, under the complete operations doctrine, the injury occurred during the loading process. *Id.* at 234. It found that it did not. *Id.* at 234-35. It explained that

> " 'unloading' has been completed when, subsequent to removal of the material from the [insured] vehicle, the deliverer has finished his handling of it, and the material has been placed in the hands of the receiver at the designated reception point, despite the fact that it is necessary to transport the material thereafter to another point." *Id.* at 234.

¶ 40    In *Menard*, the vehicular insurance policy provided coverage for bodily injury " 'caused by an accident resulting from the ownership, maintenance[,] or use of an insured vehicle, including loading and unloading.' " (Emphasis omitted.) *Menard*, 2013 IL App (3d) 120340, ¶ 8. The underlying plaintiff backed up her insured vehicle so that Menards employees could load the bricks she had purchased into her vehicle. *Id.* ¶ 5. The plaintiff exited the vehicle, looked for good bricks from the stack, and placed them in reach of a Menards employee to load them into the vehicle. *Id.* While the Menards employee was loading the vehicle with bricks, the plaintiff's "foot became tangled in debris or packing materials near her vehicle and she fell, sustaining multiple injuries." *Id.*

14

¶ 41        The *Menard* court first considered whether Menards was using the vehicle (with the plaintiff's permission). It noted, as had the supreme court in *Schultz*, that other jurisdictions had construed the word "use" in vehicular insurance policies to be broader than "operation" and to include "loading and unloading." *Id.* ¶ 21. It determined, however, that it need not look to other cases to determine whether the word "use" generally includes loading and unloading because the policy itself instructed that it did. *Id.* ¶ 22.

¶ 42        The *Menard* court then considered whether the injury occurred during the process of loading and unloading. *Id.* ¶ 26. It recited the complete operations doctrine as providing that "loading includes the entire process of moving an article, including acts in preparation for loading." *Id.* ¶ 27. The *Menard* court determined that, because the plaintiff was injured while the Menards employee was loading bricks, she was injured "during the complete operations of loading her vehicle with bricks." *Id.*

¶ 43        In support of its position that loading should be limited to handling or moving the article to be loaded, Farmers focuses on the language in *Menard* that "loading includes the entire process of *moving an article*, including acts in preparation for loading." (Emphasis added.) *Id.* Farmers then cites several cases where the injury occurred as a result of handling the article to be loaded. See, *e.g.*, *Merit Insurance Co. v. Parent Building Materials, Inc.*, 176 Ill. App. 3d 965, 969 (1988) (the insured unloaded plasterboards in a negligent manner, triggering the policy's unloading provision even though the injury occurred after the delivery vehicle left the scene); *Woodside v. Gerken Food Co.*, 130 Ill. App. 3d 501, 507 (1985) (the insured had not completed unloading the potatoes when he left them in an improper location, causing an injury after the delivery vehicle left the scene); *Toler v. Country Mutual Insurance Co.*, 123 Ill. App. 3d 386, 390-91 (1984) (the insured was "loading" a rifle onto his insured truck when he removed rifle shells outside the truck

15

in preparation for loading the rifle onto the truck and the rifle accidently discharged). Farmers concludes that preparations for loading, unrelated to the actual handling of the intended product, are not loading for purposes of the complete operations doctrine.

¶ 44    We disagree that the loading process is limited to the actual handling of the article to be loaded. Importantly, when the supreme court in *Estes* adopted the complete operations doctrine, it specifically rejected the coming to rest approach, which limited the unloading process to the actual moving of the article. *Estes*, 79 Ill. 2d at 233. The supreme court favored coverage for "all the operations" necessary to effectuate a completed delivery. *Id.* These operations would, as the *Menard* court otherwise noted, include acts in preparation for loading. *Menard*, 2013 IL App (3d) 120340, ¶ 27. Indeed, the alleged facts in *Menard* were that the plaintiff tripped over debris or packing materials that could have been placed by the Menards employee loading the vehicle. *Id.* ¶ 29. The alleged negligence in *Menard* did not concern the actual moving of the bricks being loaded but, rather, preparatory or incidental moving of surrounding debris or packing material. *Id.* ¶¶ 5-6.

¶ 45    At oral argument, Farmers cited *Heape v. Bituminous Casualty Co.*, 36 Ill. App. 2d 131 (1962), for the first time. There, the appellate court determined that the underlying defendant, employed by United Electric Coal Company (United Electric), was not loading a vehicle when he operated a bulldozer owned by United Electric to push mats into a position to be lifted onto the truck of the insured, Keene Trucking Service, by a Keene Trucking Service crane. *Id.* at 135. Initially, we observe that *Heape* is factually distinguishable. As the *Heape* court noted:

    "We are not faced with the problem of determining whether pushing [the] mats into position to be loaded, if this were in fact a part of [a] continuous act to be undertaken by

16

Heape which would be culminated by the act of loading [the] truck by Heape as a part of his activities, would constitute 'loading.' " *Id.* at 136.

Here, in contrast, Menards was responsible for the ultimate act of loading the siding onto the van. More significantly, *Heape* was decided prior to our supreme court's adoption of the complete operations doctrine.

¶ 46    Contrary to Farmers' position, courts applying the complete operations doctrine have determined that preparatory steps necessary and integral to the loading process, including preparing the area and/or preparing the supporting equipment for loading or unloading, can be part of the loading process and therefore constitute use of the insured vehicle. *Kennedy*, 688 A.2d at 92 (the selection of loading pallets prior to the loading of goods was a necessary and integral part of the loading activity); *Drew Chemical Corp. v. American Fore Loyalty Group*, 218 A.2d 875, 880 (N.J. Super. Ct. App. Div. 1966) (the process of unloading the acid from the insured vehicle necessitated the preparatory act of the clearing of the line, which, in turn, caused the accident); *American Employers' Insurance Co. v. Brock*, 215 S.W.2d 370, 371, 373 (Tex. Civ. App. 1948) (insurer was liable for injuries to a pedestrian who fell into an open sidewalk elevator shaft when employees in charge of the insured truck left doors open while obtaining cross bars to guard the shaft even though nothing had been either loaded onto or unloaded off of the truck at time of fall).

¶ 47    Farmers' argument amounts to an assertion that the loading process had not yet begun, because Menards had not yet touched Cirone's siding order. However, the complete operations doctrine includes acts in preparation for loading. *Menard*, 2013 IL App (3d) 120340, ¶ 27; see *Drew*, 218 A.2d at 878 (the vehicle's arrival at the site and initial attempt to hook up the hose were sufficient to establish that unloading had begun, even though the hose was soon removed to clear a blockage before any of the liquid left the vehicle); *Pellicano v. Royal Indemnity Co.*, 229

17

N.Y.S.2d 654, 656 (Sup. Ct. 1962) (unloading of an insured truck began when it arrived at the job site). In this case, Cirone drove the cargo van to the loading site. Menards allowed Cirone into a guarded area that it had designated for storing and loading orders and told Cirone where to park within the loading site. The house siding was in Menards' possession, and Cirone showed paperwork establishing that the siding was to be loaded onto his cargo van. According to Cirone, Menards told him where to stand while the material was being loaded. Beltran believed himself to be working in concert with Granados to load the order and that his work was integral and necessary to the loading process, agreeing that there was "no other way." Cirone was injured by a forklift that had moved less than two feet after setting down material obstructing the siding while Granados, who was assigned to lift the siding, had positioned his forklift and had begun to approach the siding in order to retrieve it and load it onto Cirone's vehicle. Farmers notes that Cirone had yet to open the doors to his cargo van, but this argument ignores that Menards had planned to place the material on the roof of the van. In total, these facts support that the injury occurred during the loading process.

¶ 48                    D. Sufficient Causal Connection: *Menard* and *Aryainejad*

¶ 49          Next, we consider whether the injury was causally connected to the use of the insured cargo van. As noted, the instant policy provides coverage for damages due to bodily injury "arising out of the *** use" of the cargo van. "The words 'arising out of' have been interpreted broadly to mean originating from, incident to, or having a causal connection with the ownership, maintenance or use of the vehicle." *Aryainejad v. Economy Fire & Casualty Co.*, 278 Ill. App. 3d 1049, 1051 (1996). As such, there must be some causal relationship between the injury and the ownership, maintenance, or use of the vehicle for there to be coverage. *Id.* at 1052. Strict proximate cause, however, is not required. *Menard*, 2013 IL App (3d) 120340, ¶ 28. Instead, the Third District

18

applies the "reasonable contemplation" test to determine if there was a sufficient causal connection. *Id.*; *Aryainejad*, 278 Ill. App. 3d at 1054.[1] Under the reasonable contemplation test, the court considers whether the negligent act that caused the injury was a reasonable incident or consequence of the use of the automobile. *Menard*, 2013 IL App (3d) 120340, ¶ 28. As such, the reasonable contemplation test affords coverage when the injury results from an activity that presented the type of risk that the parties reasonably contemplated would be covered by the policy. *Id. Menard* and *Aryainejad* guide our analysis on this issue.

¶ 50    In *Menard*, we reasoned that the trip and fall injury potentially resulted from the reasonably contemplated activity of loading the insured vehicle with bricks. We rejected the insurer's argument that the alleged negligent act, allowing debris to accumulate on the premises, had nothing to do with the use of the vehicle. *Id.* ¶ 29. Instead, we recognized that

> "[t]he debris or packing material could have been placed there by the Menards employee loading [the] vehicle, or been disturbed by the loading process. Because [the] complaint does not specifically allege that the debris existed independently of the loading, or that the debris did not originate from the loading process, the injury *potentially could have resulted from Menard[s'] use of the vehicle*." (Emphasis added.) *Id.*

¶ 51    *Aryainejad* provides additional guidance for the causal connection sufficient to satisfy the reasonable contemplation test and result in coverage. *Aryainejad*, 278 Ill. App. 3d at 1055; *cf. id.*

---

[1]In *Aryainejad*, the Third District adopted the reasonable contemplation test over the more permissive "but for" test used by the Fifth District in *Toler*, 123 Ill. App. 3d at 392 (sufficient causal connection where an insured returning from a hunting trip accidentally discharged a rifle, shattering glass and causing injury to another, when removing shells in preparation for loading the rifle back in the insured vehicle).

19

at 1055-58 (Slater, J., dissenting). In *Aryainejad*, the vehicular insurance policy covered injuries caused by the "use" of other, uninsured vehicles. *Id.* at 1050 (majority opinion). The policy owner swerved to avoid a pedestrian walking down the middle of the interstate. *Id.* The act of swerving caused the policy owner to lose control of his vehicle, and he suffered injury. *Id.* The pedestrian had been driving an uninsured vehicle when the vehicle ran out of gas. *Id.* The pedestrian left the vehicle to walk to a gas station. *Id.* The pedestrian later admitted he had been drinking when he chose to walk in the traffic lane instead of on the shoulder of the road. *Id.* at 1050, 1055.

¶ 52    In determining whether the accident "arose out of" the pedestrian's use of the uninsured vehicle, the appellate court applied the reasonable contemplation test and answered in the affirmative, explaining:

> "Vehicles frequently break down or run out of gas. When this occurs, drivers must often leave their vehicles to find help, thereby creating a risk to themselves and to other drivers who may lose control of their vehicles while taking evasive action. Thus, [the pedestrian's] act of walking on the interstate after his car ran out of gas and the risk he posed to other drivers were reasonable and foreseeable consequences of the use of his vehicle. Accordingly, we hold that [the pedestrian's] actions were within the risk for which the parties to the contract reasonably contemplated there would be coverage, and thus, [the policy owner's] injuries arose out of [the pedestrian's] use of his vehicle." *Id.* at 1054.

¶ 53    In so holding, the appellate court rejected the insurer's argument that the pedestrian's vehicle did nothing more than transport him to the site of the accident and the pedestrian's decision to walk in the traffic lane instead of on the shoulder of the road was an independent act that broke the chain of causation. *Id.* at 1054-55. It reasoned that the pedestrian's actions originated from and were incident to the use of his vehicle regardless of the manner in which he walked. *Id.* at 1055.

20

¶ 54    Turning to the instant case, we determine that the injury to plaintiff's foot caused by the forklift resulted from an activity reasonably contemplated by the parties, *i.e.*, using a forklift to load an insured cargo van with cargo. Surely, drafters of an insurance policy providing coverage for a cargo van, which did not have windows or seating behind the driver, contemplated that the cargo van would be used to load cargo and that forklifts were a likely method by which to load cargo. See *My Personal Taxi*, 2019 IL App (1st) 190164, ¶ 23 (the company that insured a livery vehicle should have contemplated that it would be used to load and unload passengers); see also *Blasing v. Zurich American Insurance Co.*, 2013 WI App 27, ¶ 19, 346 Wis. 2d 30, 827 N.W.2d 909 (where Menards injured the policy owner while loading the policy owner's truck, the insurance company could expect "use" to include loading, in part because the insured vehicle was a pickup truck).

¶ 55    In at least one respect, the instant facts are more compelling than in *Menard*, where the debris *could* have been placed during the loading process. Farmers and Menards agree that the forklift ran over Cirone's foot after just having removed an obstacle blocking the siding that was to be loaded. Similarly, the instant facts are also more compelling than *Aryainejad*, in which the dissenting justice argued that a pedestrian's act of walking down the center of the interstate was too attenuated from his past use of the vehicle to trigger the duty to defend. *Aryainejad*, 278 Ill. App. 3d at 1057 (Slater, J., dissenting).

¶ 56    Here, the alleged negligent acts—securing the loading area, failing to warn Cirone of the "dangerous" forklift activity, and operating the forklift—were directly related to loading the insured vehicle and were not attenuated or remote to the injury; rather they occurred in a close, related sequence. Cirone testified that Menards allowed him into a gated loading area and directed him to position the van "close" to the product wall. The product racks were 22 feet long, and the

order was 16 feet long. Cirone initially stood between the product wall and Beltran's forklift; moving mere feet brought him into harm's way. The large equipment, including two forklifts and a cargo van, as well as the sizeable order, the siding, measured against testimony that 60 feet was a comparatively far distance, creates the impression of a tight workspace. The related events unfolded rapidly, with Sanchez testifying that, as Beltran reversed less than two feet, Granados's forklift had already lined up with the order. Menards employees and Cirone looked up at the order in anticipation of its movement. Cirone was injured seconds later. The act of using two forklifts in concert to bring cargo onto an awaiting cargo van is obviously connected to the intended use of loading the cargo van as opposed to an independent act. In fact, the only deviation from the loading plan was that Cirone apparently stepped several feet from the spot where he was told to stand while he was looking at one of the two forklifts working to accomplish the loading. This occurred in the middle of a series of steps orchestrated by Menards to load the insured cargo van. Again, those steps included deciding the placement of the van; instructing Cirone where to stand during the process; and using two forklifts in concert to remove an obstacle and lift the target article, transport the target article to the cargo van, and place and secure the target article to the roof of the cargo van.

¶ 57 We are not persuaded by Farmers' argument that Cirone's injury was not causally connected to the use of the cargo van but instead was connected to the use of an entirely different vehicle, the forklift. It matters not whether the Menards employee picked up the cement obstacle with his hands and dropped it on Cirone's foot or whether, as happened, he picked up the cement obstacle with a forklift and drove the forklift over Cirone's foot. That two or more vehicles may have been working in concert to load the insured vehicle does not prevent the insured cargo van from being a third vehicle in use. See *Austin-White ex rel. Skow v. Young*, 2005 WI App 52, ¶¶ 10-

22

15, 279 Wis. 2d 420, 694 N.W.2d 436 (the injury "arose out of" the use of loading the stationary, insured pickup truck, even though the injury occurred when a separate vehicle, a Bobcat, moved toward the insured truck and prematurely dropped its load).

¶ 58 The aforementioned distances and timeframes set forth in the record are at odds with the dissent's characterization of the evidence. In particular, we disagree with the dissent's assertion that there were no plans for how the order would be transported from the product rack onto the cargo van—an assertion contradicted by Farmers' own characterization of the Gomez deposition. Without citation of authority, the dissent would seemingly require a detailed loading plan as opposed to, as here, certain established steps and the assumption of responsibility for securing the order to the vehicle while allowing room to troubleshoot. We also disagree with the dissent's assertion that the cargo van was not positioned close to the order awaiting an imminent delivery— an assertion contradicted by Cirone's express testimony that he parked the van "close" to the order as well as Cirone's and Sanchez's testimony that Cirone was injured by the first forklift while looking at the second forklift lining up with its order. The record does not support the dissent's contrary assertions that it is "clear" that the van was not close to the order (and, thus, the injury) and that it is also "impossible to decipher" the van's location in relation to the injury. Relatedly, we disagree with the dissent's repeated reference to "inside" or "enclosed" storage bays as though the bays created barriers between the order, the injury, and the van. To the contrary, Beltran testified that large orders such as Cirone's were in the outside yard. Cirone testified that, after showing his paperwork, he returned outside. He further testified, "It's not bays, it's one wall that's all it is." So long as *some* evidence supports coverage, the trial court correctly determined that Farmers had a duty to defend. Moreover, the duty to defend cannot be negated merely by

23

conflicting allegations of fact, even assuming *arguendo* those facts have some support in the record.

¶ 59    While we appreciate the dissent's reluctance to extend coverage for incidents occurring too far down the causal chain, the facts here do not warrant this concern. In this case, Menards caused the insured cargo van to be positioned in the loading area for the purpose of loading. Menards instructed Cirone to stand in a spot it (incorrectly) considered safe while the loading occurred. It is difficult to imagine that loading the type of large material that the insured cargo van was built to accommodate could have been accomplished in a single step without other equipment, and here, the steps during which the injury occurred are separated by mere feet and seconds. Forklift one reversed two feet as forklift two was then lining up with the order. Simply put, for the purposes of establishing a duty to defend, the alleged facts support that the injury occurred while Menards, a permissive user,[2] was using the cargo van to load cargo, and the injury was causally connected to said use.

¶ 60    E. Eight Corners Rule

¶ 61    Farmers seeks to avoid this result by arguing for the first time on appeal that the circuit court should have applied the "eight corners rule." To apply the eight corners rule, the court compares the four corners of the underlying complaint with the four corners of the insurance policy to determine whether the alleged facts potentially fall within the policy's coverage. *Farmers Automobile Insurance Ass'n v. Danner*, 2012 IL App (4th) 110461, ¶ 44. If the underlying

---

[2]The dissent incorrectly states that Cirone was the "insured," but Menards was the "insured" using or responsible for the use of the insured vehicle with Cirone's express or implied permission. *Infra* ¶ 99.

24

complaint fails to set forth facts that bring the case within, or potentially within, the policy's coverage, there is no duty to defend. *Id.*

¶ 62    Here, the insurance policy required Menards' use of the cargo van to trigger coverage. The underlying complaint did not describe Menards' use of the cargo van. Instead, Menards submitted, and each party pointed to, extrinsic evidence—such as depositions and answers to interrogatories—to support its position as to whether Menards was using the cargo van at the time of the injury. As such, and as Menards does not dispute, application of the eight corners rule does not bring the case within, or potentially within, the policy's coverage such that there would be a duty to defend.

¶ 63    However, Farmers never objected when Menards attached extrinsic evidence to its motion for declaratory judgment and/or its motion for partial summary judgment, nor did it ask the circuit court to apply the eight corners rule. Issues not raised in the circuit court are forfeited. *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14. The purpose of the forfeiture doctrine is to ensure that the circuit court is "given an opportunity to correct any errors prior to appeal and that a party does not obtain a reversal through [its] own inaction." *Id.* In this case, not only did Farmers fail to object to Menards' introduction of extrinsic evidence, it also later pointed to the extrinsic evidence to further its own cross-motion for summary judgment.

¶ 64    Forfeiture aside, Farmers has not persuaded us that the circuit court would have been required to apply the eight corners rule. Courts may bypass the eight corners rule and consider factual matters external to the underlying complaint if the factual matters do not bear upon the issues in the underlying litigation or impact the underlying plaintiff's ability to pursue a theory of liability. *Pekin Insurance Co. v. St. Paul Lutheran Church*, 2016 IL App (4th) 150966, ¶ 64. "[T]he

eight-corners rule bars extrinsic evidence only if, as a result of the proposed declaratory judgment, the plaintiff in the underlying lawsuit could be hampered by collateral estoppel." *Id.*

¶ 65 Collateral estoppel applies when a party, or someone in privity with a party, participates in two separate and consecutive cases arising on different causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction. *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 389-90 (2001). "Application of the doctrine of collateral estoppel must be narrowly tailored to fit the precise facts and issues that were clearly determined in the prior judgment." *Id.* at 390-91.

¶ 66 Farmers does not define collateral estoppel or explain what collateral estoppel concerns exist here other than to write that (1) "deciding factual issues via extrinsic evidence outside of the allegations in the complaint did carry collateral estoppel concerns" (opening brief), and (2) the deposition testimony pertained to the conduct of Cirone and Menards' employees (reply brief). These points fail to explain why a decision in this case that Menards was "using" the insured cargo van would bear on any element of Cirone's underlying negligence case against Menards. Farmers has not shown why Cirone would have been hampered in his underlying negligence case.

¶ 67 At oral argument, Farmers appeared to concede that the procedural issue of whether the *circuit court* erred in considering extrinsic evidence is forfeited. Farmers continued, however, that it merely asks *this court* to apply the eight corners rule anew to decide the duty to defend issue. Even if the argument that this court should apply the eight corners rule anew may not be forfeited, it is unavailing. Farmers otherwise fails to explain how our consideration of extrinsic evidence raises collateral estoppel concerns in an underlying lawsuit that has settled.

¶ 68 III. CONCLUSION

¶ 69    The judgment of the circuit court of Will County is affirmed.

¶ 70    Affirmed.

¶ 71    PRESIDING JUSTICE McDADE, dissenting:

¶ 72    I respectfully dissent from the majority opinion based on its flawed forfeiture analysis and unwarranted extension of the complete operations doctrine and its associated precedents. I begin with the majority's erroneous conclusion that Farmers has forfeited its "eight corners" argument.

¶ 73    Although the majority correctly notes that Farmers did not raise the eight corners argument in the trial court, its conclusion that the "issue" has, therefore, been forfeited fails because it ignores the critical distinction between the role "issues" and "arguments" play in the process of appellate review. As the majority notes,

> "[h]ere, the parties filed cross-motions and, thus, they agree that *** *the disposition of the case turns on the circuit court's resolution of purely legal issues*. *Maryland Casualty Co. v. Dough Management Co.*, 2015 IL App (1st) 141520, ¶ 45. ***
>
> *The construction of an insurance policy is *** a question of law* appropriate for disposition by summary judgment and reviewed *de novo*." (Emphases added.) *Supra* ¶¶ 24-25.

The majority also correctly states that the *issue* here is the proper construction of the language in the duty to defend clause in the insurance policy, with that policy language being subject to our usual rules of contract interpretation. *Supra* ¶ 25. Those rules of contract interpretation, in turn, mirror the rules traditionally used to construe statutory provisions. See *Village of Kirkland v. Kirkland Properties Holdings Co.*, 2023 IL 128612, ¶ 63 (stating that, "[s]imilar to statutory construction, when construing a contract, the primary objective is to give effect to the contracting parties' intent").

27

¶ 74    Where the majority goes astray in concluding that Farmers has forfeited the eight corners argument is in deeming it to be an "*issue*" that may be forfeited. It is not. It is an *argument* that Farmers made to aid in this court's construction of the policy language, which is a legal issue. Recognizing that fundamental distinction is critical when considering any forfeiture argument.

¶ 75    Menards' argument further demonstrates its misunderstanding of forfeiture by asserting that raising a new "argument" on appeal "results in forfeiture of that issue." That assertion improperly conflates the distinct legal concepts of "issues" and "arguments." In support, Menards cites *In re Marriage of Farrell*, 2017 IL App (1st) 170611, ¶ 24 (*IRMO Farrell*), which stated, " 'It is well settled that an unsuccessful party may not advance a new theory of recovery on appeal' [citation], and that doing so results in forfeiture of *that issue* (see, *e.g.*, *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14 (issues not raised in the trial court are forfeited)." (Emphasis added.) That statement in *IRMO Farrell*, however, misapprehends the forfeiture rule as explained by our supreme court in *1010 Lake Shore*.

¶ 76    In its statutory construction analysis in *1010 Lake Shore*, the supreme court specifically rejected the notion that "issues" and "arguments" are interchangeable and clearly enunciated the distinctions in the treatment of the two concepts when reviewing a forfeiture claim. As the court clarified:

> "We now address the remaining issue in this appeal on the construction of section 9(g)(3) of the [Condominium Property Act (765 ILCS 605/9(g)(3) (West 2008))]. Defendant asserts its argument 'mirrors' the appellate court dissent. ***
>
> Initially, plaintiff contends defendant forfeited its argument relying on canons of statutory construction because it did not raise that argument in either the trial or the appellate court. Plaintiff argues that defendant failed to even acknowledge the second

28

sentence of section 9(g)(3) in the trial and appellate courts, and it cannot now argue that section 9(g)(3) conflicts with the Foreclosure Law.

Defendant's contention based on canons of statutory construction is merely *one argument addressing the issue of the proper construction of section 9(g)(3). Even if defendant did not make that specific argument in the trial or appellate court, defendant has consistently disputed the issue of statutory construction.* This court *only requires parties to preserve issues or claims for appeal.* They are *not required to limit their arguments in this court to the same ones made in the trial and appellate courts. Brunton v. Kruger*, 2015 IL 117663, ¶ 76. Accordingly, defendant's statutory construction argument is not forfeited." (Emphases added.) *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶¶ 16-18.

Thus, despite quoting from this discussion, the appellate court in *IRMO Farrell* failed to apply the critical distinction our supreme court made between "arguments" and "issues" for purposes of applying the forfeiture rule and, instead, used the two terms interchangeably, misstating the applicable law.

¶ 77    Here, the majority's analysis suffers from the same fatal flaw. Viewed properly, the eight corners rule is merely an argument addressing the proper construction of the duty to defend clause in the insurance policy; it is *not* a new *issue*. If the supreme court's explanation in *1010 Lake Shore* is applied correctly, Farmers did not forfeit the eight corners argument by raising it for the first time on appeal. Accordingly, I dissent from the majority's forfeiture discussion.

¶ 78    Turning to the merits of the parties' arguments on the proper construction of the duty to defend clause, the majority focused on whether "the circuit court correctly found, for the purposes of establishing a duty to defend, that Menards was 'using' the van." *Supra* ¶ 1. If Menards was

29

"using" the van at the time of Cirone's injury, it was covered by the policy and entitled to a defense provided by Farmers in Cirone's underlying negligence case. The determination of whether Menards is covered by Cirone's auto insurance policy hinges on the proper construction of section 7-317(b) of the Illinois Vehicle Code (625 ILCS 5/7-317(b)(2) (West 2016)), as well as the language in Farmers' policy.

¶ 79        Section 7-317(b)(2) of the Code states:

> "(b) Owner's Policy.—Such owner's policy of liability insurance:
>
> ***
>
> 2. Shall insure the person named therein and *any other person using* or responsible for the use of *such motor vehicle* or vehicles with the express or implied permission of the insured[.]" (Emphases added.) *Id.*

Similarly, coverage under Farmers' auto policy also depends on Menards' "use" of Cirone's vehicle at the time of the injury. Under that policy language, Farmers "will pay damages for which any insured person is legally liable because of bodily injury to any person and/or property damage arising out of the ownership, maintenance or *use of a private passenger car, utility car, or utility trailer.*" (Emphasis added.) Unfortunately, neither the statute nor the policy defines the scope of the covered "use."

¶ 80        To resolve that question, we must apply the usual rules of construction, with our primary objective being to effectuate the parties' intentions. To do so, the policy language must be given its plain and ordinary meaning if that meaning is clear and unambiguous. *Menard, Inc. v. Country Preferred Insurance Co.*, 2013 IL App (3d) 120340, ¶ 18; *supra* ¶ 25. In ascertaining that " 'plain, ordinary, and popular meaning,' " the words used must " 'be construed with reference to the

30

average, ordinary, normal, reasonable person.' " *Acuity v. M/I Homes of Chicago, LLC*, 2023 IL 129087, ¶ 30 (quoting *Sproull v. State Farm Fire & Casualty Co.*, 2021 IL 126446, ¶ 19).

¶ 81 Relevant to the instant appeal, our supreme court has already provided guidance on what constitutes the "use" of an insured vehicle when it reviewed the un- and under-insured motorist policies at issue in *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 401 (2010). The language in those policies provided coverage for " 'any other person *using or responsible for the use*' of the subject vehicle with the express or implied permission of the insured. 625 ILCS 5/7-317(b)(2) (West 2004)." (Emphasis added.) *Id.* As the court explained, "the use of an automobile has been held to denote its employment for some purpose of the user." *Id.* That definition is consistent with our rule that policy language should be construed consistent with how it would be understood by "the average ordinary, normal, reasonable person" and not in a fashion that unreasonably distorts its common meaning. Those standards provide critical guidance for our determination of whether Menards was, in fact, "using" Cirone's van within the meaning of the policy at the time of the injury.

¶ 82 Here, the facts are not in dispute. The Menards employees had decided to move the pallet of landscape blocks with the first forklift to make Cirone's order more accessible. That forklift was never intended to be used in moving Cirone's order. After that pallet was relocated, a second forklift was to remove the order from the storage rack and place it on the ground inside the storage bay. The workers had no definite plans for how the order would then be transported from inside the storage bay to Cirone's cargo van, which remained parked somewhere in the warehouse yard outside. Even after the order was moved outside to the van, the workers were uncertain how it would ultimately be loaded onto the van. It is clear that the workers did not know whether the order would be placed inside or on top of the van; they had no set plan for the remainder of the

31

process. Thus, absolutely no evidence shows when and how the van would have been used during the delivery process or even the extent to which Menards employees would be involved in that process after they initially relocated the order from the rack to the floor of the storage bay.

¶ 83   In addition, the evidence shows that Cirone was standing inside the storage bay, as directed by the Menards employees, waiting for his order, at the time he was injured. The majority asserts that "Menards employees saw Cirone standing by the product rack in a spot they considered 'safe' before he moved several feet to a spot they considered unsafe, at which point the accident unfolded within seconds." *Supra* ¶ 10. It is clear from the record, however, that no Menards employee ever instructed Cirone to remain in any particular spot. Moreover, neither Cirone nor his van was involved in actually moving any material, and neither interacted with it in any way prior to his injury. In fact, his order remained untouched by anyone prior to Cirone's injury. The evidence also clearly establishes that the first forklift driver had already completed his assigned task of moving the pallet of landscape blocks and the forklift no longer had any contact with the pallet, when the driver backed over Cirone's ankle.

¶ 84   Having established the relevant facts, we are tasked with applying the law to them as instructed by our supreme court. That task requires us to apply the plain and ordinary meaning of "use" to the instant set of facts. It is clear that Cirone's vehicle was positioned outside the storage bay and was not close to either the order or the forklift when he was injured. It was not awaiting an imminent delivery at that time, and the Menards employees made it clear that they had no plan for how the order would eventually be moved out of the storage bay and into the warehouse yard, where it could be loaded onto the vehicle. Under those facts, neither Cirone nor Menards was "using" the van for any purpose within the plain and ordinary meaning of that word when the injury occurred. Naturally, the van was intended to come into play in some way at some point in

32

the process, but that point was never reached. Because the van was not present at the site of the injury and was not actively connected to *any* part of the distinct processes of removing of the order from the storage rack and, subsequently, loading it outside, it was never "employ[ed] for some purpose of the user," as required to find a duty to defend. See *Schultz*, 237 Ill. 2d at 401. Accordingly, under the plain and ordinary meaning of the relevant language, the van was not actually being "used" by Menards when Cirone was injured, and Farmers was not contractually obligated to provide Menards with a defense in Cirone's negligence action.

¶ 85    Recognizing as it must that the van was not, in any real-world sense, actually being used at the time of the accident, however, the majority maintains that Farmers had a duty to defend because Menards was involved in "acts in preparation for loading" when the injury occurred. To make that argument, the majority invokes the "complete operations" doctrine, citing *Estes Co. of Bettendorf, Iowa v. Employers Mutual Casualty Co.*, 79 Ill. 2d 228, 233 (1980), and *Menard*, 2013 IL App (3d) 120340. *Supra* ¶¶ 13, 35-47. When applied to the unique facts of the instant case, however, that assertion fails to support the majority's conclusion that coverage exists.

¶ 86    Indeed, multiple factors distinguish the facts in the instant case from those in *Estes* and *Menard*. Critically, the policies in *Estes* and *Menard expressly included loading and unloading a vehicle as a covered "use.*" Farmers' policy contained no such provision. Moreover, nothing in those decisions even hints that the complete operations doctrine would be equally applicable to policies of insurance that do *not expressly provide coverage via a loading clause*. Nonetheless, the majority relies on those disparate analyses and policy provisions to find a duty to defend here.

¶ 87    Even a cursory examination of the factual scenario in *Menard* demonstrates the inapplicability of that analysis. There, the appellate court found coverage for the plaintiff's injury after she "tripped over debris or packing materials that could have been placed by the Menards

33

employee loading the vehicle." *Supra* ¶ 44; *Menard*, 2013 IL App (3d) 120340, ¶ 29. Here, Cirone's injury was not even loosely connected to debris that was created during the loading process. Under the majority's rationale, coverage for damages that occurred during that process included all prior related activities because "[t]he alleged negligence in *Menard* did not concern the actual moving of the bricks being loaded but, rather, preparatory or incidental moving of surrounding debris or packing material." *Supra* ¶ 44.

¶ 88        What the majority failed to note in *Menard*, however, was that, "*[w]hile the Menards employee was loading her car with the bricks*, [the plaintiff] alleged, her foot became tangled in debris or packing materials near her vehicle and she fell, sustaining multiple injuries." (Emphasis added.) *Menard*, 2013 IL App (3d) 120340, ¶ 5. Thus, although the plaintiff was not *directly* injured by bricks being actively loaded into her car, she was undoubtedly hurt while engaged in "acts in preparation for loading." *Id.* ¶ 27. In fact, the plaintiff was *personally involved* in the loading process when she was injured. The court stated that the plaintiff was actively involved in "look[ing] for good bricks from the stack, [which she] then placed *** within reach of the Menards employee to load into her vehicle." *Id.* ¶ 5. Thus, the plaintiff and the Menards employee were both actively involved in critical parts of the loading process when the plaintiff was injured, even if the injury did not occur directly due to "the actual handling of the article to be loaded" (*supra* ¶ 44). Here, however, the facts are quite different.

¶ 89        Cirone was not participating in the activity taking place within the storage bay in any way when he was injured. He was merely waiting for his special order. Although the majority notes that some employees saw Cirone move a few feet from one spot to another before he was hit by the forklift (*supra* ¶ 10), employees also stated that Cirone had never been instructed to remain in any particular spot. Nor was his van parked in the immediate vicinity of the material that would

34

eventually be loaded; instead, it was parked somewhere in the open warehouse yard outside that enclosed storage bay. Under those circumstances, neither Cirone nor his van was actively engaged in *anything* that could be rationally deemed to be a loading or "pre-loading" activity. Moreover, Cirone's order was not yet available, and none of the normal preloading and loading processes, including selecting specific materials and making contact with and moving at least part of the order, had even begun when the forklift unexpectedly ran over his ankle. Because the facts in *Menard* are so easily distinguishable from those in the instant appeal, it offers no support for the majority's conclusion.

¶ 90    As previously noted (*supra* ¶ 80), this court's primary goal in reviewing the applicable policy language by applying our traditional rules of construction is to effectuate the parties' intention, as expressed by that language when given its plain and ordinary meaning. *Menard*, 2013 IL App (3d) 120340, ¶ 18. Here, the policy did not define the loading and unloading of a vehicle as a covered "use," while the policies in *Estes* and *Menard* expressly included a loading clause. Moreover, our supreme court has stated that the applicable point of reference when examining the plain and ordinary meaning of policy language is that of " 'the average, ordinary, normal, reasonable person.' " *Acuity*, 2023 IL 129087, ¶ 30 (quoting *Sproull*, 2021 IL 126446, ¶ 19).

¶ 91    Based on the undisputed facts in the instant appellate record, it is highly unlikely that "the average, ordinary, normal, reasonable person" would conclude that Cirone's van was being "used" by Menards at the time he was injured. The van was stationary and parked outside the storage bay that held Cirone's order, making it inaccessible for loading when the injury occurred. Prior to Cirone being injured, no Menards employee had had any contact with that vehicle. Despite the majority's claims to the contrary (*supra* ¶¶ 3, 56, 58), the Menards employees had no specific plan on how to transfer the order to Cirone's vehicle after getting it down from the rack and placing it

35

in the floor of the storage bay and were not even sure if it would ultimately be placed on the roof or inside the van. As our supreme court has dictated, this court must apply the policy language to the facts using the perspective of " 'the average, ordinary, normal, reasonable person.' " *Acuity*, 2023 IL 129087, ¶ 30 (quoting *Sproull*, 2021 IL 126446, ¶ 19). From that perspective, Cirone's vehicle was neither being employed for the user's purpose nor " 'put[ ] to [any] service of a thing' " when the injury occurred. See *Kim v. State Farm Mutual Automobile Insurance Co.*, 2014 IL App (1st) 131235, ¶ 19 (quoting *Schultz*, 237 Ill. 2d at 401). Thus, the facts failed to "support that the injury occurred during the loading process" as the majority contends (*supra* ¶ 47).

¶ 92    Viewed from the proper perspective, Menards' contrary argument distorts the ordinary meaning of "use" beyond normal recognition. From the standpoint of an average reasonable person, the connection between Menards' purported "use" of the van and Cirone's order was simply too attenuated from any loading or preloading activity involving the order to support a finding of coverage. Under the view of Menards and the majority, Menards would be entitled to a defense from Farmers even if the forklift driver had injured a random customer as it went from one end of the store to another to reach the storage bay because that, too, was part of the necessary preloading activity. Indeed, a myriad of other distantly related activities would also necessarily be covered, even though they most assuredly would not have been within the parties' contemplation when they entered into the insurance contract and reside well outside the realistic limits of the average, reasonable person's understanding of a loading activity. Without any cognizable limits, it is difficult to imagine just how far down the causal chain coverage would extend. By adopting Menards' reasoning, the majority has unjustifiably, and unwisely, extended the completion doctrine far beyond both everyday experience and any existing state precedents.

36

¶ 93       In an effort to bolster its analysis, the majority seeks support from a purported causal connection between Cirone's vehicle and his injury under the "reasonable contemplation" test. Under that test, coverage exists if the injuries were sustained as the result of an activity that fell within the risk reasonably recognized by the parties. *Aryainejad v. Economy Fire & Casualty Co.*, 278 Ill. App. 3d 1049, 1055 (1996). In reaching that conclusion, the *Aryainejad* court recognized that liability exists in only limited circumstances, explaining, for example, "an automobile must do more than merely transport a person to the site where an accident occurs for coverage to apply." *Id.* at 1054.

¶ 94       Here, no evidence ties the van to the cause of the injury other than its use in transporting Cirone to Menards. It was never used or even touched by Cirone or any Menards employee after his arrival at the store. Moreover, in both *Aryainejad* and *Menard*, the court explained that the reasonable contemplation test only

> "affords coverage where the injury is the result of an activity that presented *the type of risk that the parties reasonably contemplated would be covered* by the policy. *Aryainejad*, 278 Ill. App. 3d at 1054. Applying this test, the court must determine *whether the negligent act which caused the injury was a reasonable incident or consequence of the use of the automobile*. *Aryainejad*, 278 Ill. App. 3d at 1053 (citing *Westchester Fire Insurance Co. v. Continental Insurance Cos.*, 312 A.2d 664, 669 (N.J. Super. Ct. App. Div. 1973))." (Emphases added.) *Menard*, 2013 IL App (3d) 120340, ¶ 28.

It is unfathomable that a reasonable, ordinary person would recognize the risk of Cirone's ankle being run over by an errant forklift as "the type of risk that the parties reasonably contemplated would be covered by the policy" or conclude that Menards' negligent operation of the forklift "was a reasonable incident or consequence of the use of the [van]." See *id.* It is undisputed that the van

37

was never implicated in any portion of the loading process or in the preparations undertaken by Menards prior to start of that process. It was not even located near the site of the injury.

¶ 95        *Aryainejad* also offers additional rationale supporting the conclusion that coverage does not exist here. In considering whether coverage applied, that court examined the impact of intervening causes, noting that

> "an assault by the driver of a vehicle is an act which is independent and unrelated to the ownership, maintenance or use of a vehicle. Regardless of whether a vehicle creates a condition that leads to an assault, injuries resulting from an assault are not a normal or reasonable consequence of the use of a vehicle." *Aryainejad*, 278 Ill. App. 3d at 1054–55.

Similarly, here the forklift driver's failure to use standard safety protocols, such as simply looking back before reversing the forklift, is an intervening causal factor in Cirone's injuries. Injuries due to a forklift driver's failure to back up in a safe manner "are not a normal or reasonable consequence of the use of a vehicle" such as Cirone's van. *Id.* Nothing in the appellate record supports the finding of a reasonable causal nexus that ties Cirone's van to his injuries. Consequently, no duty to defend exists, or potentially exists, under Farmers' insurance policy.

¶ 96        In addition, the key to applying the reasonable contemplation test is determining "whether the alleged negligent act that caused the alleged injury was a reasonable incident or consequence of the *use of the insured vehicle*." Here, however, the majority appears to rely on the generic nature of the insured vehicle, focusing on the fact that Cirone drove a cargo van rather than on the actual consequences of "the use of" that vehicle under the facts of this case (*supra* ¶¶ 49, 54). *First Chicago Insurance Co. v. My Personal Taxi & Livery, Inc.*, 2019 IL App (1st) 190164, ¶ 22.

¶ 97        The majority cites *My Personal Taxi*, 2019 IL App (1st) 190164, and a Wisconsin appellate case, *Blasing v. Zurich American Insurance Co.*, 2013 WI App 27, 346 Wis. 2d 30, 827 N.W.2d

38

909, to argue that "the injury to plaintiff's foot caused by the forklift resulted from an activity reasonably contemplated by the parties, *i.e.*, using a forklift to load an insured cargo van with cargo." *Supra* ¶ 54. Further clarifying its reliance on the type of vehicle at issue instead of its actual use in the case, the majority asserts that "[s]urely, drafters of an insurance policy providing coverage for a cargo van, which did not have windows or seating behind the driver, contemplated that the cargo van would be used to load cargo and that forklifts were a likely method by which to load cargo." *Supra* ¶ 54. That assertion misreads both *My Personal Taxi* and *Blasing*.

¶ 98        Although the decisions in both cases recognized the potential relevance of the type of vehicle to the reasonable expectation that it would be used to load the cargo at issue, that factor was merely incidental to the courts' inquiry. See *Blasing*, 2013 WI App 27, ¶ 18; *My Personal Taxi*, 2019 IL App (1st) 190164, ¶ 24. In each case, the type of vehicle being loaded was relevant only to the extent that it could "reasonably" be expected to carry the intended load, presumably as a subordinate factor in the critical inquiry of whether the "injury results from an activity that *presented the type of risk that the parties reasonably contemplated* would be covered by the policy." (Emphasis added.) *My Personal Taxi*, 2019 IL App (1st) 190164, ¶ 22. Because any one of a wide range of vehicles could potentially be capable of moving the materials at issue, the insurance policies in *My Personal Taxi* and *Blasing* would have been applied equally to a broad spectrum of vehicles. The classification of the insured vehicle as a pickup truck, a taxi, or even a cargo van, simply provides evidence that is relevant to the reasonable expectations of the insurer and the insured and constitutes a subsidiary part of the court's analysis. In both cases, the heart of the courts' analysis was whether the injury occurred while the insured vehicle *was being used* within the meaning of the policy and whether the parties to the insurance contract *reasonably contemplated the risk of that harm*, not on the type of vehicle involved. Consequently, both courts

found coverage only where the injury occurred while the vehicle was *actually* being used in the loading process, undermining the majority's reliance on both *My Personal Taxi* and *Blasing* here.

¶ 99 Moreover, both cases are readily distinguishable on their facts. In *My Personal Taxi*, the plaintiff, who was legally blind, alleged that he was injured when an agent of a livery service, which offered nonemergency, medical transportation to the public, drove him to a hospital for a medical appointment. On arrival at the hospital, the driver allegedly caused the plaintiff's injuries by walking him into a cement pillar while escorting him from the vehicle to the hospital entrance. *Id..* ¶ 5. In reviewing the case, that court adopted the rationale used by the Tennessee Supreme Court in *Travelers Insurance Co. v. Aetna Casualty & Surety Co.*, 491 S.W.2d 363, 365 (Tenn. 1973), which concluded that " 'the entire process involved in moving the goods is covered' '[i]n commercial situations *** *from the moment the insured takes possession until delivered at the point of destination.*' " (Emphasis added.) *My Personal Taxi*, 2019 IL App (1st) 190164, ¶ 25 (quoting *Travelers Insurance Co.*, 491 S.W.2d at 365). In contrast, here the "insured," Cirone, *never* took possession of his order because Menards did not even touch it prior to his injury, distinguishing the analysis in *My Personal Taxi*.

¶ 100 Similarly, in *Blasing*, 2013 WI App 27, ¶¶ 1, 4, the plaintiff "was injured by an employee of Menard, Inc. *while the employee was loading Blasing's truck with lumber*" that she had purchased at a Wisconsin Menards store. (Emphasis added.) The injury occurred when "a Menards employee used a fork lift to load the boards into Blasing's truck" while "*Blasing was standing next to her truck. During this loading process*, a few boards fell and struck Blasing's foot, causing injury." (Emphasis added.) *Id.* ¶ 4. Here, Cirone was not standing even remotely close to his vehicle, and that vehicle was not even arguably engaged in any active loading process when he was injured; indeed, Cirone's order had not even been touched at that time.

¶ 101    The key facts in the analyses in *My Personal Taxi* and *Blasing* clearly established the active and contemporaneous loading or unloading of an insured vehicle, facts that stand in sharp contrast to those in the instant case. The evidence readily demonstrates that Cirone's van, located somewhere outside the storage bay in the warehouse yard, had absolutely no connection to the conduct of the forklift driver inside those bays that resulted in Cirone's injury. Accordingly, the conduct of Menards' employees did not even potentially fall within Farmers' duty to defend under the stated rationales in both *My Personal Taxi* and *Blasing*. The majority's reliance on those decisions is misplaced.

¶ 102    Nonetheless, the majority maintains that "the alleged negligent acts—securing the loading area, failing to warn Cirone of the 'dangerous' forklift activity, and operating the forklift—were directly related to loading the insured vehicle and were not attenuated or remote to the injury; rather they occurred in a close, related sequence." *Supra* ¶ 56. Despite extensive evidence about where the van was generally located in relation to the site of the injury, its precise location remains impossible to decipher. Even the testimony about the general layout of the area was inconsistent, with Menards employees repeatedly referring to storage bays that Cirone denied were present. In addition, the majority also acknowledges that Cirone initially stood where he was directed by the Menards employees and contends that "moving mere feet [from that spot] brought him into harm's way." *Supra* ¶ 56. Although not noted by the majority, the deposition testimony establishes that none of the Menards employees ever told Cirone not to move even a short distance from that location. By instead focusing on the speed at which the injury occurred, the majority ignores Menards' inherent duty to operate its forklift in a safe manner, adhering to fundamental safety principles such as requiring a forklift driver to look over his shoulder before backing up.

41

¶ 103    Moreover, the deposition testimony shows that Menards' "loading plan" was far from comprehensive or well orchestrated, as the majority suggests. See *supra* ¶¶ 56, 58. The only fully planned steps were using the first forklift to make Cirone's order more accessible by moving the pallet of landscape block that Menards had previously stored in front of it and then using a second forklift to reach the order and place it on the ground inside the storage bay, a step that was never attempted. After that, the evidence does not indicate whether the material would be moved from the floor inside the storage bay to the van in the outside yard or whether the van would be brought into the storage bay. What is clear, however, is that the employees did *not* plan to immediately load Cirone's van after removing the order from the rack. Even after the order was moved to be in the vicinity of the van, the employees did not know how it would be loaded or even whether it would be stowed inside or on the top of the vehicle.

¶ 104    The majority also attempts to tie the van physically to the location of the injury, but the record does not support that assertion. Although Cirone was broadly instructed to park somewhere *outside* the storage bay that held his order when he first entered the warehouse yard, he could not have specifically parked his van "close" to that order because he had no idea where it was located inside the large storage building at that point. He only learned the actual location of the order after he left his parked vehicle, entered the storage building, and received directions on where to go. He testified that he did not know where the van was in relation to where he was standing when he was injured.

¶ 105    Even more importantly, the specifics of Menards' "plan" to reach Cirone's order is not one of the two touchpoints to be considered when applying the reasonable contemplation test. *Supra* ¶¶ 49, 95, 97. The intended scope of coverage contemplated by the insured and the insurer here, Cirone and Farmers, is one of those two mandated points, however. *Menard*, 2013 IL App (3d)

42

120340, ¶ 28 (explaining that the reasonable contemplation test "affords coverage where the injury is the result of an activity that presented *the type of risk that the parties reasonably contemplated would be covered* by the policy. *Aryainejad*, 278 Ill. App. 3d at 1054" (emphasis added)); *supra* ¶ 95. Because Menards' alleged "plan" was developed much later, it had absolutely *no* impact on the intended scope of the Farmers policy.

¶ 106　　　　In addition to the foregoing legal analysis, practicality also strongly counsels the rejection of the majority's resolution of this case. Insurance providers are companies we love to criticize, and yet they provide an invaluable service to people who are ill, injured, or victims of accidents or violent crimes or identity theft—and the list goes on. We count on them to be there when we need them and to charge reasonable premiums for that security. When courts demand coverage— defense or indemnification—based not on the reasonable understanding of the parties but on the inventiveness and verbal agility of lawyers and judges, we force these *businesses* to retain viability by continually increasing their premiums to pay for unforeseen, and reasonably unforeseeable, coverage extensions that they have been deemed obligated to provide. Here, Cirone purchased auto insurance. It is not reasonable to believe that either he or Farmers contemplated an obligation to pay for injuries caused by a Menards employee carelessly running over his ankle with a Menards forklift while doing Menards work on a Menards site—coverage that Menards has, or reasonably should have, already purchased for itself. See *Aryainejad*, 278 Ill. App. 3d at 1055 (explaining the "reasonable contemplation" test).

¶ 107　　　　For all these reasons, I reject the majority's forfeiture analysis and its strained attempts to string together a number of loosely related doctrines to find coverage in this case and respectfully dissent.

*Menard, Inc. v. Illinois Farmers Insurance Co.*, **2024 IL App (3d) 230431**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 17-MR-0609; the Hon. John C. Anderson, Judge, presiding. |
| **Attorneys for Appellant:** | Glenn F. Fencl and Garrett L. Boehm Jr., of Johnson & Bell, Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | W. Anthony Andrews and John E. Motylinski, of Ottosen DiNolfo Hasenbalg & Castaldo, Ltd., of Naperville, for appellee. |